Welcome you here today. We have a very short docket, but that doesn't mean we're not interested in maintaining our time limit. So when the yellow light comes on, you have two minutes, and when the red light comes on, we ask you to conclude your argument. A couple people yesterday had a hard time trying to do that, but we know you can do it, unless you're answering a question from the court. Also, we have read the briefs and record excerpts. We have not necessarily been into the entire record, so we appreciate record citations when you can give us those. First case of this morning is number 19-20465, Baldwin v. Dorsey, and we'll hear first from Ms. Bradley. Good morning, Your Honor. You're not an assistant U.S. attorney, are you? You're with Harris County, right? A couple years ago I was. I was a special assistant United States attorney, so you might have some old information on me. I guess we do. Maybe you need to update it. Thank you. I did. I'm now an assistant county attorney. I gathered that. Okay, thanks. I was younger and thinner then, Your Honor. So were we all. Yeah, absolutely. May it please the Court, I am Suzanne Bradley, and I represent Deputy Latosha Dorsey, the appellant. This is an interlocutory appeal based on the denial of Deputy Dorsey's defense of qualified immunity by the district court. I want to begin today by saying that this court has jurisdiction to hear this appeal. Because the lower court said there was no material fact that is sufficient to show deliberate indifference to plaintiffs' serious medical need. For without materiality, there is no constitutional violation of our rights. In addition, this court has jurisdiction because there is no robust consensus of cases that support the denial of qualified immunity to Deputy Dorsey. The denial of a motion for summary judgment based on qualified immunity is immediately appealable under the collateral order doctrine to the extent that it turns on an issue of law. That is the Manus case, 585, Fed 3rd, 839. The pin side is 842. In the case of a state of Allison v. Wainsley, this court's opinion, although not precedential from 2013, this court wrote that our jurisdiction on appeal is limited. We have jurisdiction to determine whether a factual dispute is material, but not whether it is genuine. In addition, this court has written that the scope of clearly established law and the objective reasonableness of those acts of the defendant, in this case our deputy, that the district court found the plaintiff could prove at trial are legal issues that this court will review de novo. And that is the Thompson case, 245, F3rd, at 456. The district court denied Deputy Dorsey's defense of qualified immunity by finding her conduct was objectively unreasonable in light of clearly established law. And the record site there is 1, 2, 3, 4. The test to determine whether defendants are entitled to qualified immunity, first, whether the facts taken in the light most favorable to the plaintiff show the defendant's conduct violated a constitutional right and whether that right violated was clearly established at the time of the defendant's alleged conduct. Why don't you move on to the facts? We're pretty familiar with the general rules. Yes, Your Honor. One minute. Plaintiff Paul. What do we do with the district court's statement that the deputy did nothing? I mean, isn't that a, you were just talking about what we have the ability to review legal, the legal implications versus whether there's a genuine dispute. How do we deal with that finding from the district court? First of all, I don't think the deputy did nothing. I know you don't think that, but what do we do with the district court's statement that's contrary to that? In that statement, Your Honor, I view that as the court saying, first of all, the court, I think, contradicted itself. The court wrote that it's not clearly established what steps should be taken once someone like Ms. Baldwin outcried that she was suicidal. And then he said, but the deputy did nothing. Here's what the deputy did. The deputy on video said to the EMS driver, are you going to take her? The deputy heard Ms. Baldwin say to the EMS driver that she was not suicidal and she would not self-harm. On video, we also heard the EMS driver try several times to get Ms. Baldwin to get in the ambulance that was on site to go to the hospital. In addition- The district court never mentioned that tape, did he? No. Not really. Well, the district court did mention that the deputy turned off her audio in the car. No, I understand that. That's a question I have otherwise. But, I mean, the whole preface to this is she gets found and EMT arrives and they're examining her. And all that she denies being suicidal is not mentioned in the court's opinion. Yes, Your Honor. And there's case law that I cite in my brief that says that when video or audio contradicts a plaintiff's assertion, the court can rely on the video as being truthful. Now, again, back to your question. How do we deal with the fact that the judge said she did nothing? I think, most importantly, Deputy Dorsey handcuffed Ms. Baldwin and put her in the back seat of her car. This entire time frame that Deputy Dorsey interacted with Ms. Baldwin started at about 1230 and ended about 5 or 6 in the morning. What is a clearly established- I mean, if you've answered, I don't mean to interrupt your answering, Judge Costa. I'll get back to you, but go ahead and ask your question. No, that's okay. I'm sorry. Let me just say, she was always handcuffed and she couldn't self-harm. She was handcuffed in the patrol car. She was handcuffed at in-talks. You see her on the eight-minute video. She was always in the presence of people in that eight-minute video. There was a nurse there taking her blood. When she was taken then finally to booking, she was handcuffed then. She outcried to a nurse at booking, and the nurse called the doctor, and the doctor said, Take her to the hospital. Ms. Baldwin arrived at the hospital at about 4 o'clock in the morning. She was there for about an hour, and St. Joe's here in downtown Houston cleared her, said she was okay, and she went back to booking. She bonded out, and here we are. So there's about three hours of time that we have that we're concerned about here today. She was found at 12.30. She was on her way downtown at 1.30. She was at the hospital about 4 in the morning. This entire time she didn't self-harm. Now, and that's because she was in the care and custody of Deputy Dorsey. Now the clearly established prong, that's the prong of qualified immunity. I cite numerous cases where there are worse facts than what happened to Ms. Baldwin. And in some cases, the person who's the plaintiff, the family is suing, the person died. There's the Tamez case, the Trevino case, the Domino case, the Estate of Allison case. I like the Estate of Allison case because it is factually similar. It is not precedential, but it is in the time frame of what happened here, and it cites the Fifth Circuit case law. And if I could talk a little bit about the Allison case, the facts of that. In that particular case, the officers rolled up on a scene and they knew this woman. They found her very intoxicated. They knew she had taken prescription medicine not in accordance with her prescription, and that's what Ms. Baldwin did. She told everybody out there she took 4 to 6 Ambien. And the deputies decided, and they also knew that she had attempted to commit suicide a year earlier, and that's more information than Deputy Dorsey had when she arrived on scene. Wait a minute. Who did that, Baldwin or Ms. Allison? I'm jumping around. I apologize. Deputy Dorsey, excuse me, Ms. Baldwin took Ambien. I know. 4 to 6, but Ms. Allison also took prescription drugs. Who knew that who had tried suicide a year earlier? Ms. Allison. Okay, that's what I was saying. Is there any deliberate indifference case involving failure to prevent suicide where the plaintiff did not try to commit suicide after the defendant got involved? I mean, that's what strikes me as a little strange about this. I mean, usually it's in a jail. The person's in the cell. They keep blankets or something in there that allows the person to then commit suicide. Here there was no suicide attempt after Dorsey arrived at the scene. I'm not going to say there's no case, though, Your Honor. That I don't know. I chose cases where deputies were initially denied qualified immunity and on worse facts where someone actually killed themselves because of the allegations that the deputy didn't do enough, which is what the lower court basically has alleged, that she didn't do enough, that she did nothing. Well, exactly. Yeah, I mean, put it another way, what is the denial of treatment here? In other words, if they had reason to believe that she had overdosed, they would have taken her to the hospital and pumped her stomach, I presume. The denial? Or is there some, does the Constitution demand immediate treatment by a psychiatrist? I'm not clear on that. Your Honor, again, there's a couple questions there. But let me start with, again, the Allison opinion. And I will cite you to the record site. Allison is 524-FED-AF-97273. And in that case, this court wrote, even if appellants treated decedent Allison's medical needs with deliberate indifference in violation of her constitutional rights, their actions were objectively reasonable. And they cite to the Brown case there. Here, this court wrote, if the defendant's actions violated clearly established constitutional rights, the court then asks whether qualified immunity is still appropriate because the defendant's actions were objectively reasonable in light of established law. I guess the obvious point that the plaintiffs are going to make is, or at least they certainly do in their brief, that your position ignores what we have to take as true, which is that Ms. Baldwin told Dorsey on the way to booking that she was suicidal. And also, I mean, I'm personally interested, well, do that first. Yes, the plaintiffs do make that argument, and we accept that fact as true. We're saying it's not material in light of all of these case laws, in light of the case law and in the fact that it doesn't show deliberate indifference. In Ms. Baldwin's deposition, she said, and I cite it in my brief, that Deputy Dorsey told her she would take her to the hospital after booking. So what we're really talking about is whether or not she should have had, whether Deputy Dorsey should have taken her to treatment at 1.30 in the morning instead of at 4. She got medical treatment. She got to St. Joe's. St. Joe's said she was okay for booking, and Deputy Dorsey had a right to rely on St. Joe's saying she was okay. And she went back to booking, and she bonded out. And she didn't kill herself. And in the Allison case, this court talks about these facts. Ms. Allison, who died, her speech was slurred. She was unsteady on her feet. She failed a field sobriety test. She misused her prescription medicine, and she presented a danger to herself and others. Ms. Baldwin fits all of those facts. But this court wrote on these facts, we cannot say by frequently monitoring decedent Allison and allowing her to sleep off all reasonable officials, in the defendant's circumstance would have known that the defendant's conduct violated the Constitution or a federal statute. And again, the pin site for that is 97573. Okay, I have two minutes left. Is there any other questions that the court has for me? Yeah, why did she turn off her audio? She shouldn't have, Your Honor. It was a violation of policy. Well, why would she even do it? Wasn't that asked at her deposition? I assume she was deposed. She was deposed. I can't recall what she said exactly, Your Honor, but I can say she shouldn't have done it. It was a violation of policy, and she was wrong to do that. And I think the lower court pointed out if she had left her audio on, you know, maybe we wouldn't be here today. But she turned it off, and that's something that I can't undo. Any other questions? Guess not. Thank you. Judge Costa, have I answered your questions? We'll consider what you say, sure. Mr. Latham. May it please the Court. Good morning. My name is Christian Latham, and I represent the Plaintiff-Appellee, Ebony Nicole Baldwin. I'd like to address two issues this morning, beginning by opposing counsel with the Court's jurisdiction and then moving into the fact that the law is, in fact, clearly established. Now, Judge Jones, you asked where is it, or why is it, rather, that the district court doesn't mention Ms. Baldwin refusing medical care on video. There's a specific reason for that, which is because no such video was presented to the district court, no such argument was presented to the district court, and insofar as I'm aware, no such video exists anywhere in the record. This is highlighted by the fact that for that proposition, that apparently Ms. Baldwin refuses repeatedly on video the offer of medical assistance, the deputy cites to deposition testimony, not a video, which you might expect if the claim is that it actually occurs on video. That deposition is to, excuse me, that citation is to the deposition of a deputy named Mark Lunsford. We actually have his dash camera video. No such representation is made. The district court did address this issue of whether or not Ms. Baldwin refused medical treatment. He determined that some evidence indicated that she did, and some evidence indicated that she didn't. It's a classic dispute of material fact. He cited for, in discussing that issue, I believe it was at ROA 1227 to the deposition of my client, Mrs. Baldwin, who says, quote, I never, excuse me, I did not refuse to go to the hospital. That's why the district court doesn't address that issue, because there's simply no record evidence to support the deputy's assertion that it happened. And in that regard, because it's particularly relevant to this court's jurisdiction. Well, I thought you said Mr. Lunsford said something about this. Mr. Lunsford at deposition says that he recalls that she refused treatment. Why isn't that admissible? It is admissible. My point is not that he didn't say that at deposition. My point is that it never occurs on video. Okay. And certainly it never occurs repeatedly on video. All right. And there is countervailing evidence. Where do you see in the district court opinion, this page you just cited says defendant produced some evidence. The plaintiff refused the EMT's urging to accept transportation to the hospital. I don't see then where the district court ever says there's evidence to the contrary of that. He doesn't address it explicitly, but there is an implication, because he cites as one of his summary judgment evidence citations the deposition of Mrs. Baldwin, where she explicitly states, and this, by the way, was one of the defendant's summary judgment exhibits, where she explicitly states, quote, I never refused to go to the hospital. The evidence that she did is also in-person testimony. It is not video recorded, and I would agree with the deputy's position that something which occurs on video may bear greater weight than individual testimony, except that despite repeated representations to the contrary, no such video exists. It just didn't happen the way it's been presented to you. Well, it's not on the record anyway. That's true, and like I said, insofar as I'm aware, it doesn't exist. But that's not the only reason. But your client, there's no evidence your client asked when the EMT's were there to go to the hospital and was refused that. There's no evidence of that directly, although what the video evidence does show is that she's, as the district court characterized her, essentially at a point of incapacity where she's not coherent or advocating on her own behalf. It's later, as she regains her faculties, that she communicates directly to the deputy, as determined by the district court. Or why couldn't the deputy view it as she only started saying she needed medical treatment once she realized she was being booked and it was a way to get out of being booked? As you know, Judge Costa, these are always factually intensive cases, and it's not simply the statement that she wanted to go to the hospital, which the district court considered in reaching its conclusion. It's the fact that the deputy knew that the EMT's wanted to take Ms. Baldwin to the hospital. The deputy knew that Ms. Baldwin had already ingested four prescriptions. Okay, wait, now I'm confused. The EMT's did want to take her to the hospital, now you're saying. So why didn't they? It's consistent with your client saying at that time, I don't want to go. It may be. It may also be that, for example, Deputy Dorsey is captured on video telling them, I've got her, you all leave. It's a genuine dispute of material fact, which at the summary judgment stage, just at the interlocutory appellate stage, must be resolved or at least viewed in the light most favorable to the non-movement here, the plaintiff. But, Judge Jones, it's not just this issue of whether or not she refused treatment. There is no indication in the facts credited by the district court that Deputy Dorsey ever heard from Ms. Baldwin or anyone else that Ms. Baldwin had claimed that she was not suicidal. There is no evidence. I'm sorry, but I'm looking at a bench memo, admittedly, but the EMT wanted to take her to the hospital even though she refused to ride in the ambulance and quote, denied wanting to harm herself, close quote, record 10-17-12-27. And that piece of evidence, an EMT report which is neither certified nor has been tested by deposition testimony, it turns out that the fire department for which those EMTs work no longer exists. Both parties have attempted to address that factual issue, but there are matters in that EMT. I'm sorry, but I don't think you raised all these admissibility issues in your brief, did you? And I'm not challenging, at least for the purposes of summary judgment, the admissibility. What I'm saying, though, is that what it raises is, as with virtually every other aspect of this case, genuine issues of material fact because the EMT report itself is internally contradictory. It says, for example, the jargon it uses is A-A-O times four. That translates in non-medical lingo to alert, aware, and oriented as to time, person, place, and situation. The video recording of communications with Ms. Baldwin plainly demonstrates that she is neither alert and aware to any of those four things. It's further contradicted by other video evidence where this is admittedly an approximation. I don't have the exact time stamp in front of me. But a person off camera several minutes after Ms. Baldwin has been placed in the backseat of Deputy Dorsey's patrol car in the entire scene, the ambulance, the cars, and Ms. Baldwin's personal vehicle have been moved out of the street. A person approaches the car, says, may I speak to her, and then for the first time apparently asks, Ms. Baldwin, do you have any medical conditions we should know about? Do you have any allergies? When she responds, I have PTSD, the person states, is that why you take those pills? That's inconsistent, or at least a reasonable jury might determine that it's inconsistent, with a report of questionable admissibility which suggests there's been some sort of fulsome evaluation of Ms. Baldwin's health. But even so, what the district court determined is that in that regard, there remain genuine issues of material fact and where those issues exist, they must be construed in the light most favorable to the non-movement. And what do you draw? What is your conclusion or the district court's conclusion about the facts most favorable? It's just that she's somewhat disoriented and claims that she has suicidal ideation. I would direct you, Your Honor, to page 1232 of the record on appeal where the district court explicitly lays out in his analysis the facts that he credits, which are specifically these. The plaintiff has shown that the defendant deputy had subjective knowledge of the substantial risk of serious harm. But I'm asking, no, I'm asking what are the facts about what Ms. Dorsey, I don't care what Ms. Dorsey knew at this point, what I'm asking is the symptoms that Baldwin communicated or exhibited. What is your position on that? How sick was she? Our position is that, to be clear, when you use the term sick, I suppose we should be precise. You be precise. You know what I'm asking. I will, Your Honor. She was experiencing a psychiatric crisis, including intense anxiety, depression, and suicidal ideations. These stemmed from her service-connected post-traumatic stress disorder. It may not be something that is apparent. So you are not asserting that she was in imminent danger of death by overdose? No, Your Honor. Okay. That's not been our position. Our position is that— Are you saying she was at risk of committing another suicide attempt? It's two things specifically, Judge Costa. It's that she was at risk of self-harm. That's what I want to ask. How is there a substantial risk of self-harm when she is in the back of this patrol car handcuffed and then later taken, I guess they're taken to draw her blood, and she's still handcuffed? She has no access to pills at that time. That's true. I don't understand how that's a risk of another suicide attempt, assuming that's the first one. Let me briefly address one factual issue, which answers your question, and it was another issue not expressly mentioned by the district court but was included in the summary judgment record, which is you've just heard from opposing counsel that Ms. Baldwin was safely handcuffed in the care of Deputy Dorsey at all relevant points, although I should note, too, that she was not delivered to the hospital at 4 a.m. It was actually an hour later. But regardless, Deputy Dorsey testified, and this is in the record as well, that while she handcuffed Ms. Baldwin upon arriving at the intox unit, it was by one hand to a bench, and there were no proactive measures whatsoever to address what she then knew was a risk of suicide and what she then knew was an ongoing psychiatric crisis. Well, if you're handcuffed to a bench, how are you going to go get the pills to take? You're going to strangle yourself with one hand? Very well might, or perhaps with a shoelace. It has happened many times, unfortunately, in the correctional context. Is there any evidence about her wearing shoelaces? There is not, but what there is evidence of is that she was treated as any other arrestee would be, despite the deputies. But she's out in the open, right? She's not in a solitary cell. She's in a holding cell, and there's also no evidence in the record that at any point in the two-hour period that she sat in that cell experiencing suicidal ideations and extreme anxiety that Deputy Dorsey ever observed her. But when she's there handcuffed to the bench, she doesn't make any other suicide attempt. And there's a question I asked the other side. Is there any case involving deliberate indifference, failure to prevent suicide, where there is no suicide attempt? This is an admittedly different case in that regard, only in the sense that she did not alternate. Usually there's a tragic suicide attempt, and usually the person died as a result, and even then often it's difficult to establish liability under deliberate indifference. That's certainly the case, although the liability turns not on the harm, provided that it's substantial, which is what the law requires, not that it be death, but rather based on the subjective knowledge of the defendant. In each of the cases that the deputy cites, apparently to rebut the proposition that what I just said was clearly established, the courts in those cases found that based on the facts presented, the individual deputies had no subjective awareness. Let's assume you're correct on your somewhat novel theory that law enforcement have a duty to do something if somebody presents and says they're suicidal. What is the clearly established standard of care? Let me address that by way of what the district court said. The opposing counsel is correct when she notes that the district court said, the law has not clearly established what you must do, but that has never been the case in the context of deliberate indifference or other civil rights claims. It's rather what you may not do. Well, that's because normally there's something objective that you know that's wrong, and she prevented her from killing herself, which is the logical consequence of having suicidal ideations. She was prevented from killing herself, perhaps. Certainly she did not kill herself. She's still alive today, right? She is indeed, Your Honor. But by no consequence of the deputy's actions. And what instead the deputy's actions did was inflicted severe psychiatric trauma when she knew what Ms. Baldwin was experiencing at the time was an ongoing psychiatric crisis. Well, let's say the deputy had first taken her to the hospital, and they look at her as they did for an hour and say she's okay, she can be cleared. And then they go and book her, and she spends a number of hours in getting her blood drawn and then being booked. I mean, wouldn't she have had the same? It seems to me that it's really about being arrested is what this complaint is about and the trauma is about. It's not the fact of arrest, the moment of handcuffs having been put on. The detention related to being, the time it took. Well, I think Judge Costa is actually having been transporting, taking herself to the hospital for the specific issue at hand, then confronting law enforcement who ordinarily you would look to for help in such a situation, asking for help and being denied for a protracted period. And Judge Jones, you were asking. But given that the hospital cleared her in about an hour, I mean, you're basically saying that the deputy should have had knowledge of this substantial risk. I mean, the hospital, if there was a substantial risk of suicide, I don't think they would have released her so soon. I'll say this, Judge Costa, it's not presented to the court on appeal. There remain genuine issues of material fact as to what occurred at the hospital. We don't specifically challenge the adequacy of the care. That's a separate claim. The claim here, to be precise, is that Deputy Dorsey, by way of deliberate indifference, caused a delay in the provision of care. However, as a matter of fact, we do take issue with the care provided. What's your best deliberate indifference case involving delayed care where there's no resulting suicide or other? I think in that case I would reiterate one thing. The standard here is that the delay results in substantial harm. And this court has found substantial harm in any number of situations that did not involve death. And in particular, where delay is at issue, I'd point the court to Easter v. Powell. This is cited in our brief. This is an Eighth Amendment case involving a prisoner, which this court has said occurs in a situation where punishment is at issue, which is distinguishing it from a case like ours where Ms. Baldwin has not been convicted of any crime and cannot be punished. But there, a prisoner for a period of approximately four hours was denied access to nitroglycerin pills for the treatment of chest pain. And this court determined that that four-hour period was sufficient to state a claim for deliberate indifference because the person experienced the substantial harm of suffering pain for four hours. I think that's analogous to suffering acute psychiatric trauma for a period of approximately three-and-a-half hours. The Easter case cites another case, Austin v. Johnson, where they consider an even shorter period of delay. But her trauma, it wasn't like the trauma ended once she went to St. Joe's and was cleared, right? I think you're saying she's had trauma for ever since then. It was aggravated or her? That's exactly right. There's two harms at issue. One is the contemporaneous suffering that was inflicted by Deputy Dorsey's deliberate indifference. And then there was the resulting harm that that suffering caused, which specifically is the exacerbation of her underlying PTSD symptoms and additional symptoms of trauma associated with that. And Judge Jones, I know you're asking about whether or not psychiatric harm can constitute a harm at all. Well, actually, I'm not exactly going to ask that, but go ahead and answer it. Well, I'll apologize that this case isn't cited in our brief, but the Woodall v. Foti case, it's at 648 F. 2nd at 268. It's not cited in our brief, but it is discussed at some length in the Partridge case, which we discuss. There, district court had dismissed a 1983 claim for failure to state a claim when a prisoner alleged that he needed psychiatric treatment, that the defendant, who was a sheriff, knew he needed psychiatric treatment and nevertheless denied it. The court said that the facts alleged showed behavior clearly evincing some psychiatric ill, just as our case here, to create a reasonable ground to believe that psychiatric treatment is necessary for his continued health and well-being. That case was decided in 1981. It's been the law of the circuit ever since. Here, not to belabor the point, but while this arises in a suicide, in the context of- Let me ask you my question. My question is, as best I understand what you're saying, your claim is that if a prisoner or a detainee claims that they are experiencing suicidal ideation, there is some imperative on the custodian to present that person to a medical facility ASAP, in some way. Well, everyone knows that the prisons are the mental health care facilities of last resort throughout the United States, and I'm sure that's true in Texas and Harris County and every small little town. How many prisoners present themselves with the possibility of suicidal ideations? And I could give you the example of my small village police department, where they have special care for suicidal ideations. But if the standard is going to be you have to go to medical care immediately, well, Jeffrey Epstein would be alive, but that's another matter. What is the standard that you're arguing for, and how far does it go? As a practical matter, you may be interested to know, Judge Jones, that actually here, if a prisoner in Harris County were to express suicidal ideations, it's actually the appropriate response that they be taken to the prison clinic. But as a constitutional matter, it may be that merely asserting suicidal ideation does not give rise, if you don't receive treatment, to a deliberate indifference claim. But that's predicated on the idea that the plaintiff must first establish the existence of deliberate indifference, namely that the facts exist. Now, the plaintiff has to assert conditions that create an injury, and then you get to the question of what is the appropriate response or the standard of care. And here, your principal basis for claiming that there was an injury is not that she had overdosed, but that she said, I'm feeling suicidal. So it is a vocal statement of the plaintiff's feelings, and that's it. It is our principal argument because it addresses the second prong of deliberate indifference, which is whether or not, essentially, the defendant knew of the harm. But it is not our only factual support lending itself to the idea that there existed a risk of substantial harm. The deputy knew of the pill she had taken. The deputy knew that it was the EMT's opinion that she needed. I'm sorry. Thank you. We know the facts, and your red light is on. Thank you. Thank you, Judge. Okay. Very thorough. Ms. Bradley. Briefly, Your Honor. On one of your questions you asked about, you made a statement about jails being the mental health treatment of last resort. In the Allison case, this court wrote one year before the events in this case, the decedent's inmate's symptoms hardly distinguish him from the multitude of drug and alcohol abusers that the police deal with every day. The deceased inmate was found in possession of drugs while acting irrationally and slurring his speech. However, an officer could hardly be faulted under Estelle v. Gamble, the Supreme Court case, for believing that the decedent inmate needed nothing more so much as to sleep it off. To accept appellant's claim would be to mandate as a matter of constitutional law that officers take all criminal suspects under the influence of drugs or alcohol to hospital emergency rooms rather than detention centers. That would be a startling step to take. He cited the Woodall case. I am not familiar with the facts of that case, Your Honor. Well, I remember the name. It's a venerable case. I just don't remember whether the inmate died or not. I don't know, Your Honor. But again, in Allison, this court wrote, while the result here was tragic, we cannot say that all or even most reasonable officers would have not done the same absent an inmate's additional external manifestations of medical distress. We note that the district court here ruled that the existence of factual disputes precluded a finding that the jailers were entitled to qualified immunity. Accordingly, we emphasize our conclusion on the basis of materiality of those disputed facts in the light most favorable to appellees that the jailers here are entitled to qualified immunity. We therefore reverse the district court's denial of qualified immunity for the individual jailers. And then I wanted to go back briefly to the argument that there's no video evidence. The record cites in my initial brief on page 3, and it's a docket entry. Well, there's no docket entry. I apologize. I write that Baldwin told the responding EMT in the presence of Deputy Dorsey that Baldwin both had PTSD and had taken 4-Ambien. Now, opposing counsel is correct. This is something that was written down by the EMT. But on video, and this is before Deputy Dorsey turned off her audio and video, you see Deputy Dorsey get out of the car and walk across the parking lot. They have towed Ms. Baldwin's car to get her out of the intersection, and she walks out to deal with the tow, and you hear someone, we don't know who, but a male voice say to Deputy Dorsey outside the car, can I talk to your lady or can I talk to your gal? And she says, sure. So he, it's a male, walks up, knocks on the door, the window comes down, and he talks to Ms. Baldwin. And he tells her, basically, I would really like to take you to the hospital. And he goes, why are you taking those pills? And she tells him, when Deputy Dorsey's out of the car, I have PTSD. And he goes, oh. And he then sort of talks to her a little bit more, and then Ms. Baldwin refuses to answer any more questions. And there is evidence that I cite, too, that shows where the deputy filled out, or excuse me, the EMT guy filled out the report saying she refused to sign the statement of refusal of treatment that he offered to her. And then she was left in the custody of Deputy Dorsey. Is that some EMT video that's not in the record? It's in the record. It's not an EMT video. It's Deputy Dorsey's video. Her dash cam video. And so the camera on the police car is pointed forward. You see outside of the car. You don't see Ms. Baldwin in the back seat. It's just the way the camera is situated. But the audio is on, and you can see that it's dark out. You can see they're in a Walgreens parking lot. You can see the tow over here. Okay, we get the point. Okay. So that is there, and the record sites are 1224 and 1017. So there is evidence of that. I have 26 seconds, and I'm just going to say that there are no genuine issues of material fact. There is no deliberate indifference on these facts. There is no robust consensus of law, and there are no damages. We're fussing about three hours. And Ms. Baldwin got treatment at the end of the night. Okay. Thank you very much.